UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


United States of America,            :
                                     :
          v.                         :  Case No. 2:05-CR-13
                                     :
Simao Monteiro                       :
     a/k/a Simon Monteiro            :
     a/k/a Alvaro Monteiro           :



MAGISTRATE JUDGE'S REPORT & RECOMMENDATION
(Paper 13)

     Defendant Simao Monteiro has filed a motion to suppress
statements made to government agents on December 23, 2004,
when he presented himself for entry into the United States
from Canada.  He claims that the statements were made
without benefit of the Miranda warnings.  On July 5, 2005,
Chief Judge Sessions referred the motion for a report and
recommendation.  An evidentiary hearing was held on August
3, 2005.  For the reasons set forth below, I recommend that
the Court DENY Monteiro's motion.  (Paper 7).

Factual Findings

     On December 23, 2004, at approximately 12:45 a.m.,
Monteiro sought admission into the United States from Canada
at the Highgate Springs, Vermont, Port of Entry.  He was a

passenger on a Vermont Transit bus from Montreal.  The bus stopped at the bus barn, a building used to process bus passengers arriving from Canada.  The bus driver exited the bus and presented the list of bus passengers to U.S. Customs and Border Protection ("CBP") Officer Jeffrey Sweeney, the officer on duty at primary inspection.  The passengers' luggage was unloaded, and each passenger retrieved the luggage before entering the bus barn to be interviewed.

<u>Primary Inspection</u>

Monteiro was the first or second in line to be interviewed by Sweeney, one of two officers conducting primary inspection.  Monteiro presented a multiple entry U.S visa and a Canadian permanent residence card to Sweeney. Both documents were in the name of Alvaro Monteiro. Monteiro told Sweeney that he was on his way to Massachusetts to visit family.  He explained that he lived in Montreal and was an auto salesman although he did not have a business card.  In response to questioning, he stated that he was part owner of a house in Massachusetts and did not own a home in Montreal.  He said that he would be in Massachusetts for a week.  He was traveling with three large bags and suitcases.  Sweeney looked in Monteiro's luggage

and found many documents, identified by Monteiro as travel documents.  Sweeney asked Monteiro for his wallet.  Upon examining the contents of the wallet, Sweeney found a U.S. Social Security card in the name of Simon A. Monteiro. Monteiro told him that the card belonged to his cousin who had left it in Montreal.  Monteiro said that he was returning the card to his cousin on this trip.

As this initial questioning progressed, Monteiro became more and more agitated, mentioning at some point that his mother had just died.  Having some questions about Monteiro's eligibility to enter the United States, Sweeney took Monteiro to CBP Officer Ellyna Larsen who was conducting secondary inspection.  To get to secondary inspection Officer Sweeney and Monteiro went a short distance from the bus barn, through a corridor into the main lobby of the border station.  Sweeney told Larsen that he had found the Social Security card in another person's name.

Secondary Inspection

Larsen has three years of experience as a border officer.  She met Monteiro at approximately 1:15 a.m.  She questioned him about the Social Security card, and he gave the same response and denied that he was Simon Monteiro.  He

3

also said that he was going to Boston for a week to visit
family and attend his mother's funeral.  His hands were
shaking and he was becoming agitated.  Larsen decided to
allow Monteiro time to calm down, and left him to inspect
other passengers.

At about 1:45 a.m. Larsen returned to Monteiro.  She
asked him if he had a criminal record which he denied. She
ran a criminal record check on both Alvaro and Simon
Monteiro.  An extensive criminal history was reported for
Simon, but nothing for Alvaro.  Again, Larsen asked Monteiro
if he had ever been arrested, been deported, or lived in the
United States.  He denied everything, including whether he
was Simon Monteiro.  Upon further questioning by Larsen,
Monteiro said that his mother had died over a year ago.
When questioned about whether he was in fact Simon Monteiro,
he became visibly upset and nervous.  Larsen then questioned
Monteiro about his possession of his cousin's Social
Security card.  Monteiro gave contradictory answers, stating
variously that he had not seen his cousin in six months, a
year and ten years.

At approximately 2:30 a.m., based on Monteiro's
behavior, responses and possession of the Social Security

card, Larsen decided that he was not admissible into the
United States because she could not establish his identity.
Accordingly, she escorted him into an adjacent room to be
fingerprinted to determine his identity and begin the
refusal process.  However, he again became agitated and
refused to allow his fingerprints to be taken.  He was
allowed to return to the lobby after he was told that he
needed to be fingerprinted to establish his identity.

At about 2:35 a.m. Monteiro indicated that he wanted to
speak to a supervisor.  CBP supervisor Gissel spoke to him
for a few minutes, and then Monteiro went outside to smoke.
During this time he also got some water.  At about 3:00 a.m.
Larsen and CBP officer Skeels searched Monteiro's luggage in
his presence.  They found many documents including two birth
certificates, under the names of Simao Monteiro and Alvarado
Monteiro.  When asked about these documents, Monteiro said
that they were false documents and documents of family
members used to disguise his true identity to escape his
past.  As the officers continued to search his luggage,
Monteiro again became visibly agitated and stated that he
would agree to have his fingerprints taken so he could
return to Canada.  Larsen took him back to the room where

the fingerprint machine was located.  At approximately 3:45 a.m., Larsen learned that the result of the fingerprint query was negative.  Larsen continued to search the luggage and discovered an order of deportation dated 9/26/1994 for Simao Alberto Monteiro.  She asked him if this order identified him.  He admitted it was his order and that he had been deported from the United States for a criminal history.  It was now approximately 4:00 a.m.  Monteiro made no further statements.  At no time was Monteiro handcuffed or physically restrained.  He was never taken to an enclosed room for questioning.  He was never told that he could not leave.

Later that morning prosecution was authorized and Monteiro was escorted to the detention area.  He later requested an application for refugee status.

                          Discussion

In his motion Monteiro initially sought suppression of all statements he made at the border.  However, at the conclusion of the evidentiary hearing, he acknowledged that statements made during the initial routine border inspection were admissible.  Accordingly, he modified his request, seeking suppression of all statements after Larsen

determined from the routine record check that Simon Monteiro had a criminal record.  At that point he contends that the routine border inspection evolved into custodial interrogation requiring the administration of the <u>Miranda</u> warnings.  He also requests suppression of his statements for failure to comply with Artrcile 36(1)(b) of the Vienna Convention on Consular Relations.  The Government responds that Monteiro was not in custody until the deportation document was found in his luggage and he admitted that he was the same person.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  This privilege does not preclude voluntary statements, however, and a person generally must invoke the privilege in order to be protected by it.  <u>Minnesota v. Murphy</u>, 465 U.S. 420, 427 (1984).

Because of the inherent pressures that exist in a custodial setting, the privilege against self-incrimination requires officers to give specific warnings to suspects during custodial interrogation.  <u>See Dickerson v. United States</u>, 530 U.S. 428, 434-35 (2000); <u>Miranda v. Arizona</u>, 384 U.S. 436, 478 (1966).  "Since <u>Miranda</u>, the Court has

'specifically stressed that it was the *custodial* nature of the interrogation which triggered the necessity for adherence to the specific requirements of its <u>Miranda</u> holdings.'" <u>United States v. Rakowski</u>, 714 F. Supp. 1324, 1333 (D. Vt. 1987) (quoting <u>Beckwith v. United States</u>, 425 U.S. 341, 346 (1976)).  In other words, a suspect is entitled to <u>Miranda</u> warnings only when he is in custody at the time of the interrogation.  <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 243 (2d Cir. 1998).

The Second Circuit has directed that all circumstances must be examined when determining whether a suspect is in custody, and the test is an objective one.  <u>Id.</u> at 243.  "[C]ustody exists for <u>Miranda</u> purposes if a reasonable person in that position would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" <u>Id.</u> (quoting <u>Thompson v. Keohane</u>, 516 U.S. 99, 111 (1995)).  That determination is further refined when a person seeks entry into the United States.

Routine border searches[1] involving investigatory

---

[1]"A routine border search contemplates the search of a person's luggage and other person effects."  <u>United States v. Moody</u>, 649 F.2d 124, 127 (2d Cir. 1981 (citation omitted).

detention and interrogation of those seeking admission to the United States "are not subject to any requirement of reasonable suspicion, probable cause, or warrant." United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985). "[Q]uestions from officials are especially understood to be a necessary and important routine for travelers arriving at American entry points." United States v. Irving, 2003 WL 22127913, at *4 (S.D.N.Y. Sept. 15, 2003) (quoting United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996)). Accordingly, "[d]etention and questioning during routine searches at the border are considered reasonable with the meaning of the Fourth Amendment." United States v. Bravo, 295 F.3d 1002, 1008 (9th Cir. 2002) (citation omitted). Moreover, "[t]he referral of a person entering this country to a secondary inspector is part of the routine border interrogation." United States v. Henry, 604 F.2d 908, 920 (5th Cir. 1979). "Such routine detention and questioning is an inevitable burden commonly associated with border crossings" and does not ordinarily create a "custodial environment" requiring Miranda warnings, United States v. Silva, 715 F.2d 43, 46-47 (2d Cir. 1983), "unless and until the questioning of the officials becomes an interrogation

that is custodial in nature in which information is sought
for the purpose of using it against such person in a
criminal proceeding."   Henry, 604 F.2d at 915 (citations
omitted).

Certainly a person in Monteiro's position would have
concluded that he was not free to leave.  However, given the
power of the government to conduct an investigatory
detention and interrogation at the border to determine
admissibility, not being free to leave does not mean that
Monteiro was under arrest.  As noted above, the government
is entitled to conduct an investigative detention at the
border.  While the duration of the detention was
approximately three hours, "there is no specific time limit
after which a proper investigative detention is
automatically transformed into an arrest." United States v.
Tehrani, 826 F. Supp. 789, 802 (D.Vt. 1993), aff'd, 49 F.3d
54 (2d Cir. 1995).  Rather, the court should consider "the
time reasonably needed to pursue the objective of the stop
and whether that objective was diligently pursued by an
efficient means of investigation."  Id. (citations omitted).
Here, the investigation of Monteiro's status was conducted
in an efficient manner.  The social security card and the

10

answers to questions raised a concern about his identity. The criminal record check alerted the inspector that if Monteiro was Simon, he would be excludable due to his criminal record.  Monteiro refused to undergo a fingerprint check which would have identified him.  A search of his luggage revealed travel documents in two names.  It was only when the deportation order was discovered and Monteiro admitted that he had previously been deported, that the inspector had probable cause to believe an offense had been committed, requiring the administration of <u>Miranda</u> warnings prior to any further questioning.  <u>See</u> <u>United States v. Henry</u>, 604 F.2d 908, 920 (5th Cir. 1979) (<u>Miranda</u> warnings required only after defendant admitted to secondary inspector that he had been born in Jamaica, not United States as he originally claimed).  No further questioning took place.

In conclusion, it is clear that the detention did not rise above the level of an investigatory detention until the discovery of the deportation documents and Monteiro's admission.  Monteiro was never told that he was under arrest, never handcuffed or otherwise restrained, and never accused of a crime.  There was never a show of force.  He

11

was allowed to go outside to smoke and leave the lobby to get a drink of water.  He was interviewed in a public area, not in a private office.  Any delay in determining his identity was due to his evasive and contradictory answers and lack of cooperation, not to any effort by the inspectors to obtain evidence of crime.  Monteiro was not in custody for Miranda purposes until after his admission of his true identity.

Finally, Monteiro contends that his statements should be suppressed because the government failed to comply with the Vienna Convention on Consular Relations by informing his consulate of his detention.  This claim lacks merit.  See United States v. De LaPava, 268 F.3d 157 (2d Cir. 2001) (indictment not subject to dismissal for violation of Vienna Convention.)

I recommend that the defendant's motion to suppress statements be denied.

<u>CONCLUSION</u>

For the foregoing reasons, I recommend that the Court DENY Monteiro's motion to suppress.  (Paper 7).

Dated at Burlington, in the District of Vermont, this 19th day of August, 2005.


                              /s/ Jerome J. Niedermeier
                              Jerome J. Niedermeier
                              United States Magistrate Judge



Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  Failure to file objections within the specified time waives the right to appeal the District Court's order. See Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).